Vanatta *v.* New Jersey Mutual Life Insurance Co.

---

Jacob Vanatta, attorney-general,

*v.*

The New Jersey Mutual Life Insurance Company.

The charter of a mutual life insurance company provided that in case of losses exceeding the funds on hand, the policy-holders should be assessable, *pro rata*, therefor, and liable to forfeiture of their policies for non-payment of such assessments, which were also made collectible by suit, provided the assessment should not exceed the amount of the note or obligation given by them. The company was, by this court, decreed to be insolvent.—*Held,*

(1) That claims arising before the decree was entered (on ordinary policies by death and on endowment policies whereon payment had been made of all that could ever be payable) were entitled to be paid as debts, in the order in which they severally accrued, and that the other policy-holders were subject, under the charter, to assessment to satisfy such claims, notwithstanding the insolvency of the company.

(2) That the holders of similar claims arising after such decree, were not to be considered as creditors of the company, nor payable as such.

(3) That the condition of insolvency is not, in such case, of itself, destructive of the obligation to contribute.

(4) That a policy-holder might not set off against his own bond and mortgage, representing a debt due from him to the company, the amount of premiums paid by him to the company on a policy not yet due.

On petition in the nature of an information under the forty-eighth section of the act " for the regulation and incorporation of insurance companies." Application for distribution or disposition of assets, on the following petitions:

Mrs. Josephine Walworth's, for payment of a policy for $12,000, issued by the defendants on the life of her late husband, Nathan Walworth, who died January 10th, 1877.

Amanda Neff's, for payment of a policy of $10,000, on the life of her husband, Harmanus Neff, who died March 9th, 1877.

Eliza Munro's, for payment of a like policy for $5,000, on the life of her late husband, Antonio Munro, who died August 9th, 1876.

Catharine Kiley's, for payment of a like policy of $5,000, on the life of her late husband, James Kiley, who died January 2d, 1875.

Anson M. Baker's, for payment of a claim whereon judgment was recovered by him against the defendants in the United States circuit court, December 4th, 1873, for $11,737.75. This claim was on a life policy issued upon the joint lives of Baker and his wife, payable to the survivor.

William P. Nicholas's, for claim on an endowment policy issued by the defendants in his favor for $5,000, due March 26th, 1877.

Henry Prinz's, for leave to offset the premiums paid to the defendants on a life policy issued by them to him, against money due them from him on his bond and mortgage, given to them for money lent by them to him.

*Mr. E. Mercer Shreve*, and *Mr. Robert Sewell* of New York, for Josephine Walworth and Amanda Neff.

Vanatta *v.* New Jersey Mutual Life Insurance Co.

*Mr. Cortlandt Parker* and *Mr. R. Wayne Parker*, for Eliza Munro and Catharine Kiley.

*Mr. Joseph Coult,* for William P. Nicholas.

*Mr. A. Q. Keasbey,* for holders of policies the time for payment whereof had not arrived when the decree of insolvency was made.

*Mr. Ludlow McCarter* and *Mr. B. Gummere,* for the receiver.

*Mr. T. A. Jobs,* and *Mr. A. M. Bingham* of New York, for Anson M. Baker.

*Mr. P. H. Gilhooley,* and *Mr. John Davenport* of New York, for Henry Prinz.

THE CHANCELLOR.

The New Jersey Mutual Life Insurance Company was organized under a special act of the legislature of this state, approved March 19th, 1863 (*P. L. 1863, p. 395*). By its charter it was authorized to make insurances predicated upon the lives of persons, on such terms and conditions as should from time to time be ordered and provided for by its laws, and to make contracts upon any and all conditions appertaining to or connected with life risks, of whatever kind or nature. And the charter provided that if, at any time, it should so happen that there should be just claims on the corporation for losses sustained, to a greater amount than it had funds on hand to discharge, in such cases the directors for the time being should, with all convenient expedition, proceed to assess such deficiency, in a ratable proportion, on the members of the corporation or their lawful representatives, according to the amount of each member's insurance; provided, that such assessment should not exceed the amount of the note or obligation given by such member;

2

which rates of assessment should be approved of by a majority of the directors, and notice in writing was to be given to such member or his lawful representative, of the assessment and the amount which the member or his representative should be required to pay. And it was provided that each and every member or his lawful representative so notified, should pay the assessment to the treasurer for the time being, within sixty days after such notification, and, in default thereof, should forfeit all right or claim to any policy or privilege which he might have obtained, and be no longer a member of the corporation, and should be liable for the amount of such assessment, with interest, to be recovered by action of debt, with costs of suit, before any court of competent jurisdiction. All persons who should insure in or with the corporation were to be deemed and taken to be members of the corporation, and an insurance to the amount of at least $500 was declared necessary to entitle a member to vote for directors.

On the 30th of January, 1877, a petition in the nature of an information was filed by the attorney-general, under the provisions of the forty-eighth section of the act "to provide for the regulation and incorporation of insurance companies," approved April 9th, 1875; and, on the 8th of February following, an order was made appointing a receiver temporarily, and an injunction was issued prohibiting the company from transacting business. On the 1st of May following, a decree was made declaring the company insolvent, and continuing the receiver, with the usual powers in such cases, and enjoining the company from further exercising its franchises or transacting business.

The questions which are presented by the petitions have reference either to the distribution or disposition of the assets of the company, and it will be enough to say that they are, first, whether death claims and claims on endowment policies due before the decree of insolvency, are entitled to preference over the claims of the holders of other policies, whether the contingency on which they were payable hap-

pened after that decree or has not happened at all, or whether all claims on policies, whether for losses or return of premiums, are to stand on an equality in the distribution of the assets; and, secondly, whether the holder of a policy not due when the decree was made, has a right to offset the premiums paid thereon against the money due from him on his bond given to the company for money lent by it to him.

As to the first question, it appears to me quite clear that the answer to it must depend on the question whether those who are insured in the company are or are not, by the mere fact of the insolvency, absolved from the obligations to which they would otherwise undoubtedly be subject. It is not necessary, in view of the above quotation from the charter, to speak at any length in regard to those obligations. It is clear that, under the charter, if there were just claims for losses to a greater amount than the company had funds in hand to pay, the policy-holders, all of whom were members, would have been respectively liable to pay a ratable proportion of the deficiency, according to the amount of their respective insurances, not exceeding, however, the amount of their respective premium notes, and that the payment could have been enforced by suit. It is argued (and the argument was presented with very great ability) that the decree, if not the condition, of insolvency itself, is destructive of this obligation, and releases the policy-holders from all liability to contribute to the losses which have occurred previously thereto, as well where they have been established by judgment as where they have not. The argument is, that the purposes of the organization are frustrated by the decree of insolvency, and the mutuality which characterizes it and its objects is, *ipso facto*, rendered impossible, and, therefore, those who hold policies which, if the company had been solvent, would have entitled them to payment, and, if necessary, to contribution from their fellow-members whose policies were not due, have, in view of the insolvency, and because of it, no claim superior to the claim of the latter for return of premiums. This argu-

ment is based on the theory that the mutual life insurance plan is but a partnership, and, therefore, when the purposes for which the partnership was created have proved impossible of attainment, the partnership itself is at an end. This view of the subject was repudiated in *Mut. Benefit Life Ins. Co.* v. *Hillyard, 8 Vr. 444.* If it be considered that the policy-holder whose claim becomes due is not himself liable to assessment, but is to receive the amount of his insurance from the company, and when his loss is paid he ceases to be a member, and if it be not paid he may maintain suit against the corporation for it, and so reach his fellow-members for contribution, it is obvious that the analogy of partnership will not hold. His contract with his fellow-members was not to bear any part of his own loss. He was to help to bear theirs, if theirs happened before his. His fellow-policy-holders bound themselves, in consideration of his payments and his obligation to contribute, if necessary, to pay the money which would be due on their contracts if theirs matured before his, to contribute, if necessary, to the payment of the money which would be due on his if it should mature before theirs; and when the contingency happened, when the period of payment arrived, the mutuality which, up to that time, had continued, at once ceased. The policy-holder whose policy became due thereupon, *ipso facto*, became a creditor.

If this view be correct, it follows that all policies which were due when the decree of insolvency was made, are entitled to be paid as debts of the company, and are not to be put on the same footing with the claims for return of premiums, and it makes no difference whether the claims were in judgment or not; but they should, in view of the limitation of the amount of the assessment to the amount of the premium note, be paid in the order in which they became payable by the terms of the policies. It is urged that the view which I have taken will produce results which are highly inequitable; that the claims of those whose policies, by their terms, became due after the decree of

Vanatta *v.* New Jersey Mutual Life Insurance Co.

insolvency, are as meritorious as those which came due the day before the decree, and are, in equity, entitled to equal consideration and to like treatment. But the position is untenable. The difference between the cases is that, in the one, the claim was, when the decree was made, the claim of a creditor, and, in the other, there was no claim but that of a member, which was upon the assets, after payment of creditors.

The holder of an endowment policy who, before the decree of insolvency, had paid all the premiums which, under the contract, he could ever have been required to pay, is, though the time for payment had not arrived when the decree was made, entitled to be regarded as a creditor. His claim should be considered as *debitum in presenti, solvendum in futuro.* On the other hand, the holder of such a policy, who had not paid all the premiums which could ever have been required of him under his contract, is not entitled to be regarded as a creditor.

It is a necessary consequence of the argument in behalf of the holders of policies which were not due, that if, by reason of unusual mortality, the losses of a mutual company should at any time become so great that, upon a survey of the situation, it would appear that, after payment of the losses, there would not remain sufficient assets of the company to secure to the survivors the full payment of their policies when and if they should mature, that the losses should none of them be paid, but the company should at once go into liquidation, for the benefit of all the policyholders. That proposition, if maintained, would, obviously, put an end to the business of mutual insurance. It must not be forgotten that the amount of the assessment which the policy-holder is required to pay is only so much premium, which, under the plan, he is permitted to withhold from the company until it be seen whether it will be needed to pay losses. If paid when he took his policy, it would go into a fund, out of which the matured policies would be paid. Though he retains it until called for to pay losses, the principle is precisely the same. If paid in at the outset, he

would have no right to complain if it should be taken to pay losses, even to the extent of depriving the company of means to pay his policy when it should mature. He has no more cause of complaint where the premium is withheld by him on a contract to pay it if needed to pay losses.

The view which I have taken is supported by two cases in Massachusetts, which are precisely in point: *Commonwealth* v. *Mass. Mutual Fire Ins. Co.*, *112 Mass. 116* ; *S. C.*, *119 Mass. 45*. The case of *The Security Life Ins. and Ann. Co., 11 Hun 96*, is cited as an adverse decision. The court, indeed, there held that a death claim, due before the insolvency, was not entitled to preference in payment over the claims for return of premium, but the distribution was under the New York statute, and the court took pains to establish the position that the company was not a mutual one, although it provided for participation by policy-holders in the profits of its business. The court says that such participation did not, in that case, have the effect of rendering the policy-holders members of the company in any such sense as to subject them to direct or indirect liability for its losses ; but its only effect was to diminish the premiums actually payable upon their policies, and to graduate the amount according to the prosperity and pecuniary success of the company.

The death claims, including all those in which the death happened before the decree of insolvency, and endowment policy claims which became due before that decree, including all on which all premiums which ever could have been required to be paid had the company continued to be solvent had been paid before the decree, will rank as debts, and the policy-holders will be assessed, if necessary, according to the provision of the charter, for the payment of any deficiency of assets to pay them. Should there be any surplus of assets after payment of the expenses of the trust and the debts, in which are included the before-mentioned death and endowment claims, it will be distributed among the other policy-holders.

The claim of offset made by Henry Prinz remains to be considered. According to his statement, he borrowed money, on the security of his bond and mortgage, from the company. It was a condition of making the loan to him, that he should take out a life policy in the company, and he did so accordingly. He has not paid off the bond and mortgage, and it is now held by the receiver. Prinz asks that he may be permitted to offset against the amount of that claim against him, the money paid by him by way of premiums on the policy. Of course there was no agreement, between him and the company, that those premiums should be applied to the payment of the bond and mortgage. They were paid on account of his insurance. The rank of his claim as a policy-holder is as before stated. The fact that he has in his hands assets of the company, cannot entitle him to any advantage over other policy-holders in the same rank, and the fact that he is a debtor of the company, gives him no equity over them. He is not entitled to the offset which he claims, nor to any.